Filed 2/20/14  P. v. Shrader CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>BILLY WAYNE SHRADER,<br><br>　　　Defendant and Appellant. | F064907<br><br>(Super. Ct. No. BF138419A)<br><br><br>**OPINION** |

　　　APPEAL from a judgment of the Superior Court of Kern County.  Roger T. Picquet, Judge.*

　　　Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired judge of the San Luis Obispo Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Following a jury trial, defendant Billy Wayne Shrader was convicted of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)), criminal threats (§ 422), and two counts of attempting to deter a peace officer from the performance of his duties (§ 69). The jury also found true allegations defendant committed the assault and threats because of the victim's race in violation of section 422.75, subdivision (a). In a bifurcated proceeding, the trial court found true allegations defendant suffered three prior felony convictions within the meaning of the three strikes law (§§ 667, subds. (c)-(i), 1170.12, subds. (a)-(e)), three prior convictions within the meaning of section 667, subdivision (a), and suffered four prior prison terms within the meaning of section 667.5, subdivision (b).

The trial court sentenced defendant to four consecutive terms of 25 years to life for the felony counts. It added the applicable enhancements to each count, resulting in a total term of 100 years to life plus a determinate term of 48 years. On appeal defendant challenges the trial court's denial of his request for a competency hearing, the sufficiency of the evidence to support the hate crime enhancement, the trial court's sua sponte instruction to the jury regarding the purpose of a preliminary hearing, and the trial court's failure to instruct on the lesser included offense of attempted criminal threats. In addition, he raises several sentencing issues. We find the trial court erred in failing to instruct the jury regarding the lesser included offense of attempted criminal threats and, as a result, defendant's conviction on that count must be reversed. In all other respects, the judgment is affirmed.

## FACTS

Belteshazzar Johnson was employed as a security guard at the Golden Empire Transit bus terminal in Bakersfield. On September 8, 2011, at approximately 1:30 in the afternoon, Johnson noticed defendant smoking in a nonsmoking area of the terminal. Johnson, who is African-American, approached defendant and politely asked him to

---

[1]All further references are to the Penal Code unless otherwise indicated.

move to a designated smoking area. Defendant refused, becoming irate, and said he was not "going to let any nigger tell him what to do." Defendant continued to repeat his statement and continued to use racial slurs. As Johnson attempted to calm defendant, defendant began threatening him, saying he would "cut" and kill Johnson. In support of his threat, defendant retrieved a pocketknife from his pocket and extended the blade. Johnson estimated the blade to be three to four inches in length.

In response to defendant's production of a weapon, Johnson retrieved a can of pepper spray from his duty belt and began to shake it in an attempt to get defendant to put his knife away. Undeterred, defendant continued holding the knife, threatening to cut or stab Johnson, all while hurling racial slurs at Johnson. During the ordeal, defendant lunged toward Johnson with the knife, causing Johnson to jump back in order to avoid being cut by the knife. Defendant put the knife away and Johnson called 911 to report the incident. During the call, Johnson indicated defendant might be intoxicated, although Johnson later noticed defendant did not smell of alcohol and instead thought defendant, who was 79 at the time, might be senile.

Defendant began to walk to a more populated area of the terminal and Johnson followed at a distance in order to watch defendant and make sure he would not attempt to hurt anyone else. Johnson noted he was the only security officer on duty at the time and his job was to keep the patrons safe. As Johnson followed him, defendant turned around, issued additional threats to stab Johnson while yelling racial epithets, and approached Johnson. Johnson responded by pushing defendant to keep distance between them, causing defendant to stumble backwards. Defendant once again retrieved his pocketknife, extended the blade, and said he was not afraid to stab Johnson. Johnson once again removed his pepper spray and began to shake it and attempted to get defendant to follow him to a less crowded area of the bus terminal. Johnson testified he was in fear for his safety at that time. Defendant continued to advance, saying he was going to cut Johnson and that he had "better get ready." At that point, Johnson used the

pepper spray on defendant, grabbed the knife from his hand, knocked him to the ground, and handcuffed him. Johnson propped defendant up against a pillar and offered him water to flush his eyes, but defendant was unresponsive. Once the police arrived, they took custody of defendant.

Johnson noted the entire ordeal was captured by video surveillance and the video was played for the jury. However, there was no audio on the video. The video corroborated Johnson's account of the incident.

On cross-examination, Johnson explained he had put gloves on when he was initially speaking with defendant because defendant was already combative and he suspected he would have to handcuff him and wanted the gloves to prevent the handcuffs from slipping. He also admitted he had offered to give defendant a ride or to call a cab for him, but denied ever offering to help him get onto the bus. In addition, Johnson admitted he had testified at the preliminary hearing that defendant had lunged at him with the knife before he used the pepper spray, but acknowledged after watching the video of the incident that was incorrect.

Christina Luttrull was at the bus terminal on the day of the incident and heard defendant yelling racial slurs at Johnson. At one point she saw defendant approach Johnson, and saw Johnson push defendant backwards defensively. At that point she heard defendant say Johnson committed a felony and he now had the right to "cut" Johnson. She noticed defendant had retrieved a pocketknife and attempted to stab Johnson. Luttrull admitted having two prior misdemeanor theft related convictions.

Officers Sean Spillner and Robert Pair both responded to the bus terminal. Spillner took custody of a knife pointed out to him by Johnson and arrested defendant. As Spillner and Pair escorted defendant to the patrol car, they both heard defendant say, "That nigger is as good as dead. He just committed suicide." The officers transported defendant to the hospital to be medically cleared before booking him at the jail.

4.

At the hospital, Spillner and Pair each spent some time separately guarding defendant. Spillner recalled defendant stating he was going to hire someone and pay them $5,000 to kill "that nigger" or to throw lighter fluid in his eyes. This was in reference to Johnson. Defendant also stated it was his lifetime goal to kill a police officer and he would get a trophy for doing so. Pair recalled sitting in the emergency room with defendant while an African-American family was waiting in the emergency room. Defendant began calling the family, including an approximately eight-year-old child, "niggers" repeatedly for about 20 minutes. Pair asked defendant to stop the verbal barrage, however, defendant laughed and only yelled louder. Shortly after this, defendant told Pair he understood why Bruce Sons "killed that pig" and that Sons was his hero. This was significant to Pair as a California Highway Patrol officer had been killed by Bruce Sons sometime earlier. Pair asked defendant why he was so angry and defendant replied one of his goals was to kill a police officer.

After defendant was cleared at the hospital, the officers transported him to jail. On the way, defendant told Spillner to turn around so defendant could see his face and could kill him later when he was released from jail. Defendant also stated he had "nothing to lose." Pair recalled a similar statement from defendant. Defendant angrily said, "I am going to kill you with a 30 aught 6 rifle and shoot you from a quarter mile out so you won't know what hit you."

### Defense Case

Juan Garza, a defense investigator, testified he was present when Johnson was interviewed by defense counsel. Johnson did not appear confused by the questions; he asked numerous times whether the defense had viewed the video of the incident. Garza also testified Johnson stated he had told the officers defendant lunged at him with the knife before he used the pepper spray and he intended to "stick" with that version. In addition, the defense presented evidence regarding the distance from a bench to a crack in the concrete in the area where Johnson first encountered defendant.

5.

The parties stipulated that if Spillner were recalled to the stand, he would testify Johnson had told him he had offered to help defendant onto one of the busses.

## DISCUSSION

I.    **The Trial Court Did Not Abuse Its Discretion in Failing to Order A Second Competency Hearing**

A.    **Factual History**

During the proceedings, defense counsel made a number of motions pursuant to section 1368 regarding defendant's competency to stand trial.  We will recount each instance in detail.

### 1.    *First competency hearing*

Prior to the preliminary hearing, defense counsel moved for a competency evaluation pursuant to section 1368.  After suspending criminal proceedings, the trial court conducted a competency hearing on October 14, 2011.  At the hearing, the trial court received a report from Lauren Thomas, Psy.D., concluding defendant was competent to stand trial.  According to the report, defendant understood the charges against him, understood his defenses, the court procedures and the roles of the attorneys, the judge, and the jury.  In addition, Dr. Thomas noted defendant "did not present with a mental disorder that would preclude him from" stating "his side of the case to his attorney."  However, the report did note defendant's "thought process appeared mildly impaired in that he would go off track and need to be redirected back to the topic at hand."  Defendant was diagnosed with major depressive disorder as well as alcohol dependence.  Both the prosecution and defense submitted the issue of defendant's competency on Dr. Thomas's report, and the trial court found defendant was competent to stand trial.

### 2.    *First request for a second competency hearing*

The issue of defendant's competency was not mentioned again until March 28, 2012, when the case was scheduled for trial.  After defense counsel's motion to trail the trial approximately two weeks for further investigation was denied, counsel stated she

6.

was "under the belief that [defendant] is incompetent at this time to proceed to trial." The trial court noted defendant had previously been deemed competent to stand trial by the court and inquired as to any change of circumstances. Defense counsel cited the fact defendant had subsequently been moved to the medical ward at the jail and "it was difficult and it's still difficult to speak to him about the case. His ability to communicate and other issues is pretty reasonable, but to actually speak about the case is difficult, if not impossible." Counsel further stated defendant's "behavior in court to some extent backs up or buttresses his issues of competence."

In denying the motion for a renewed evaluation under section 1368 the trial court explained: "It doesn't appear to be any substantial change in circumstance. [Defendant] has been through this court many times and he hasn't changed. He just hasn't changed. That's who he is. There hasn't been any change in circumstances." Notably, during the same hearing, while arguing the case should be trailed for further investigation, defense counsel noted defendant "is prepared to waive time if the Court would like a time waiver." The trial court denied the motion to trail the case and it was assigned to another department for trial.

### 3. Second request for a second competency hearing

Upon arriving in the trial department, defense counsel renewed her motion pursuant to section 1368, arguing defendant's

> "ability to communicate with me about the case has substantially changed. Since that report came back some of the ways—some of the indications that has changed the fact that [defendant] has gone to the medical pod which is where he's housed now.
>
> "The Court—the other courts have been aware of [defendant's] almost seeming inability to control his own—I don't—they are not necessarily outbursts, but his own conversations. And my experience with him since that time has been that he has degraded in his ability to discuss with me this case."

Counsel clarified it was "not that [defendant] can't communicate. It is that he can't communicate about his case." After determining counsel's motion was simply a renewal

7.

of the motion made earlier that day, the trial court denied the motion. During continued discussions with the attorneys, the trial court stated the following:

> "Okay, Counsel, I want to make a general statement to [defendant], if I may. [¶] [Defendant], again, good afternoon. [Defendant] you have what I would call a deep voice. And I don't want you to have communications with your attorney that everyone else in the room hears. So I'm just going to ask you when you do talk to your attorney you maybe try and keep your voice down or whisper. I don't want other people to hear your conversations."

Defendant acknowledged he was hard of hearing and others had told him he speaks loudly. The court reiterated its concern with others overhearing defendant's private conversations with his attorney due to the volume of his voice and offered to make accommodations for defendant to speak privately with his attorney.

### 4. Circumstances leading to the third request for a second competency hearing

During an evidentiary hearing outside the jury's presence, an officer testified to a statement defendant made to him on the date in question. Defendant responded, "That's a lie." Shortly thereafter, the trial court reiterated to defendant that he has "a very loud voice. When you talk to your attorney, you have to keep your voice down. The other thing I can't have is commenting on people that are speaking, whether you disagree with them or not. Do not make any comments while the people are testifying."

During voir dire, prospective jurors were questioned by the prosecutor regarding whether they would have sympathy for defendant due to his age. After one prospective juror responded that defendant's age would make no difference to him, defendant stated, "I don't want him." Later that same day while counsel was in chambers, the trial court was informed defendant made a statement one or more of the prospective jurors may have overhead. The bailiff informed the court defendant was complaining the bandages he had on his wrists due to a medical condition were too tight, and defendant stated he was "going to kill cops." Upon receiving this information, defense counsel again renewed her motion under section 1368, arguing defendant was continuing to speak

loudly so that others could hear after being admonished not to do so, and he "simply cannot help himself." The trial court denied the motion, explaining the "mere fact that someone has made statements in and of itself is not a sign of incompetency."

The trial court again admonished defendant not to speak loudly so others could hear him, and the court would make accommodations so he could speak to his attorney privately. Defendant stated he understood; he had "just said my brother when he passed away he's going to leave me his gun collection." During an additional hearing regarding what statements defendant made in the presence of the jury, a bailiff explained to the court defendant had been complaining about his bandages.

> "[Defendant stated,] my brother has a gun safe full of guns, and it's come down to it. I'm going to have to kill a cop. [¶] And he then looked at the audience and said the same thing. I'm 80 years old. These guys are mistreating me, so I'm gong to have to start killing cops."

Shortly thereafter, a prospective juror asked during voir dire whether the jurors were to "presume mental competence until we are proven otherwise." The jurors were instructed by the trial court that an individual's competence was not an issue for the jury.

During additional voir dire, while a juror was explaining his occupation, defendant stated aloud, "Illegally." Before concluding for the evening, and out of the jury's presence, the court discussed the court schedule with the parties. When the court explained they would not be in session on César Chávez Day, defendant said, "Oh, brother," and "I didn't like him."

On the next court day, voir dire was concluded without any additional comments by defendant. During trial, out of the presence of the jury, the court inquired as to whether defendant would waive a jury on the issue of his prior offenses. Defense counsel indicated she had discussed the matter with defendant, and he was willing to waive a jury as to the priors. In taking the waiver, defendant stated he thought he could not be tried twice for the same crime, and the trial court explained he was not being tried for the crime again, only that the priors were being used to enhance a sentence. Defendant

9.

waived a jury on the issue of the priors. After joining in the waiver, defense counsel brought another motion pursuant to section 1368, explaining defendant "continuously talks to me about what his attorney has told him. I think members of the jury panel at least even had questions as to whether they are supposed to assume that [defendant] is competent. At this time I would just like to bring another motion." The trial court denied the motion for the reasons previously stated.

### 5. *Circumstances leading to the fourth request for a second competency hearing*

During cross-examination of Officer Pair, the last prosecution witness, defense counsel asked if he had ever seen elderly people targeted for crimes. After Pair responded that he had, defendant stated he had been robbed three times.

Following the close of evidence and argument, during jury deliberations, the trial court placed the results of the jury instruction conference on the record. While discussing the instructions given to the jury, defense counsel informed the court defendant "is insistent upon me informing something to the Court and will not allow me to listen until I do." The court allowed defense counsel to relay the information and the following colloquially occurred:

> "[DEFENSE COUNSEL]: He wants me to let you know it is a federal crime to commit crimes against somebody who is disabled, and he is disabled.
>
> "THE COURT: All right. Are you referring to the Americans with Disabilities Act?
>
> "THE DEFENDANT: Yes, sir.
>
> "THE COURT: That would not be a crime. That would be a civil action. But I understand what you mean. I am well aware of the ADA, Americans with Disabilities—
>
> "THE DEFENDANT: I can't see. Got to help me. Can't read. Got to help me. Somebody has to help me.
>
> "THE COURT: Have to make reasonable accommodations for your disability.

10.

"THE DEFENDANT: So I have a weak heart. I have a pacemaker. I had seizures. I had— [¶] … [¶] I have cancer.

"THE COURT: Thank you for bringing the ADA to our attention.

"THE DEFENDANT: I think she should have brought it up a long time ago.

"THE COURT: We will move on."

Shortly after the above exchange defense counsel made another motion under section 1368 to have defendant evaluated regarding his mental competence. In denying the motion, the court noted it had "been carefully observing [defendant] during the trial. I find that he has been appropriate during the trial in terms of his demeanor and manner, that the only issue that I've had to talk to [defendant] about on occasion is his voice being loud. It carries to people throughout the courtroom. I do not feel that any of the circumstances that led [the court] to deny the original 1368 a week ago has, in this bench officer's opinion, changed."

Defense counsel requested to place her reasons for the motion on the record. She explained her experience with defendant "is that he speaks to me on a daily basis about what his attorney has told him and refers to somebody else. He also discusses things, as now reflected just recently, about the Americans with Disabilities Act. That's his concern. That's how he addresses his case. And I have had the same concerns since before with [the court] that [defendant] has not been able to communicate with me about the issues pertaining his case." The court declined to revisit its ruling.

### 6. *Circumstances leading to the fifth request for a second competency hearing*

The following day, during continued deliberations, the jury requested readback of portions of the trial testimony.[2] Shortly thereafter, the jury arrived at a verdict. Before

---

[2]It appears the jury requested readback of Johnson's testimony during the previous afternoon, but it does not appear the court reporter was able to provide that testimony until the following morning.

the verdict was received, and outside of the presence of the jury, defense counsel requested to make a record of "what occurred during the readback." The court, noting it was "not aware of anything," allowed counsel to make a record. Counsel stated that during

> "the readback, as the jury was sitting, [defendant] had an audible outburst that was directed at—I believe at a juror saying that she wasn't paying attention and calling her a bitch, which is consistent with other behavior that he's had throughout the trial. He's had a difficult time sitting. He's had outbursts towards Mr. Johnson as he sat on the witness stand. He's made indications and pointing forwards and so forth to [the prosecutor] as she speaks, and he's had audible outbursts to the extent the Court has actually had to instruct him to remain silent.
>
> "The other thing I would like to place on the record is one of the conversations which I had in earshot of the Court and [the prosecutor] outside the presence of the jury, when we were discussing with [defendant] the possibility of having to waive time for sentencing, as I was trying to explain to him the idea of potential waiver of time, [defendant's] only response was, 'I am an American with a disability,' and continued on and was not even able to have a conversation about sentencing or any legal issue or anything having to do with his case.
>
> "And with those statements I would just like, again, to resubmit my motion under 1368."

In response, the prosecutor noted there was no change in circumstances, explaining:

> "[B]efore we got sent here that Monday, before the defendant was sent out, he threatened to kill the Court in the courtroom, was being loud and disruptive and rude. That was on March 26. And on March 28, [defense counsel] made the same motion, and [the court] said there's no substantial change in circumstances. He's been behaving like this the whole time. And just because he engages in an outburst to the jury, Your Honor, I don't think that makes him 1368. That just means he's angry. There's no substantial change in circumstances."

The court denied the motion, finding no substantial change in circumstances. The court further explained that its "involvement in advising [defendant] to be quiet is—I wouldn't characterize it as a response to outbursts. I simply have noted that he has a loud voice

12.

and that in his conversations with [defense counsel] primarily, I wanted to make sure it did not interfere with the trial or that it was not overheard by other individuals."

The court asked defendant for his cooperation in controlling his emotions when the verdict was read. Defendant informed the court that if "my lawyer would have told you I was ADA, American with disability, it would have been a lot different, but she didn't do it." He argued others had to help him under the law because of his disabilities. The court asked defendant again for his cooperation and defendant stated he would cooperate.

As the verdict was being read, the court noted for the record that defendant made an obscene gesture to the jury, and it had defendant escorted from the courtroom. As defendant was being taken from the courtroom he said, "No fucking good.… [¶] …[¶] … 80-year-old man. Going to be sorry. Mother fuckers will be sorry. You are going to pay before I die." The remaining verdicts were read, and the jury was ultimately excused.

After a recess, defendant was returned to the courtroom for a court trial on the priors. When asked how he wanted to proceed, defendant responded, "I'll just go ahead. I am going to die pretty soon anyway. Might as well get it over with." Defendant also made the comment that he wished his "lawyer would have told you guys about ADA to begin with." The court received the evidence relating to the priors and found the prior allegations true.[3] The parties then discussed scheduling a date for sentencing. The court inquired whether defendant would be willing to waive time for sentencing due to a scheduling issue. Defense counsel responded that she had attempted to discuss the issue with defendant on "a couple of instances, and I have not—I am not able to discuss it with him sufficiently." The court, with defense counsel's permission, then explained the scheduling issue to defendant and inquired whether he would be willing to waive time for

---

[3]During presentation of the evidence, the prosecutor dismissed a prior strike allegation and a section 667, subdivision (a) enhancement based upon the same prior for insufficient evidence.

the sentencing. After defendant noted how much time he had in custody, he replied "Yeah. Yeah. It's only a month."[4] Defendant then waived time for the sentencing.

### 7. Circumstances leading to sixth request for a second competency hearing

The sentencing hearing was held on May 10, 2012, and began with defense counsel making another motion pursuant to section 1368. Defense counsel argued that

"the prosecution's response to the *Romero*[5] actually kind of lays out and can show the Court an overview of what the real issues with [defendant] have been since the beginning of this trial.

"One of the major components to being competent for trial is being able to rationally assist your attorney and your defense.

"[The prosecutor] puts in her papers the behavior triggered since the beginning of this trial, first making death threats upon [the court]; to coming into trial, making outbursts in trial, such as he's going to kill individuals; namely, the police officers or the deputies that are protecting him. He makes statements that the jury—during their deliberation, calls jurors bitches and fat pigs. All of these statements go to his inability to control himself in court.

"THE DEFENDANT: That's a lie.

"[DEFENSE COUNSEL]: All information that should go toward the Court considering a 1368.

"Subsequent to his behavior in court—not only does he flip off the jury and have to be dragged out of the courtroom because of his behavior; but subsequent—he's in the medical pod currently. His behavior in the medical pod supports the fact that the man is not competent to stand trial and certainly isn't competent today to potentially receive a multiple life sentence by the Court.

"He's flooding his jail cell. What for? The deputies don't know. They don't write it in their report. The prosecution doesn't know.

---

[4]Defendant noted it would be 35 days until the sentencing date. That calculation was correct.

[5]*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

14.

"I'd also like to discuss with the Court the facts behind the 1981 strike. But it's impossible for me to talk to my client and have him give me an answer that is rational or reasonable.

"All of this information goes to show that [defendant] is not only not competent now, but he was never competent."

The prosecutor responded that defendant

"was charged with threatening to kill the officers involved in this case.

"Between the time of the information being filed and his behavior in Department 1, threatening to kill [the court], he was evaluated by a doctor. And the doctor determined he was competent to stand trial. That finding has never been disturbed. In fact, [defense counsel] submitted upon that finding. And his behavior of continuing to threaten to kill people— nothing's changed, Your Honor. There's been no substantial change in circumstances.

"And the law says that if there's already been a 1368 report, there needs to be a substantial change of circumstances in order for the Court to grant another 1368 request. And I don't see any offer of proof of that. He's been this way the whole time."

Defense counsel responded that that original motion was filed

"months prior to going to jury trial. Since that 1368 evaluation was done, there was a significant change in my ability to communicate with [defendant], the ability to have a conversation for him to join in his defense, for him to tell me about what's going on, why it's going on, how things happen. It simply is not there.

"There was circumstances during trial off the record where the Court was present. And I was trying to have a conversation with [defendant] about a sentencing issue. And [defendant] goes off about the Americans with Disability, which is a very common subject with [defendant]. It is simply not possible for him to aid in his defense right now. Because he has no ability—he has some kind of mental health issue that causes him to be [u]nable to communicate with me about this case.

"Now—and I've said from the beginning, [defendant] has no problem communicating. He has a significant and clear problem about communicating about this case."

The trial court ruled on the motion as follows:

15.

"This case has caused me a great deal of concern—not only during the trial, but since the trial concluded—because of the difficulties presented by [defendant] at times.

"I think, [defense counsel], you have done an admirable job in representing [defendant] and presenting the best possible defense that you could. And I acknowledge that communication has been difficult with him. And in fact, I'll acknowledge that there is some sort of mental health issues with [defendant]. But my understanding of the standard is not simply some sort of mental health issue has to exist, but it has to exist to the level that it interferes with his ability to either understand the nature of proceedings that are going on and/or to effectively communicate and assist counsel in his defense.

"And although I think there may be times where it's been very difficult, I do feel he has been able to communicate and assist, not without difficulty, not without complications, but to a level that is satisfactory under the law.

"I also believe that under the history of this case, the fact that the 1368 evaluation has been done—and I'm familiar with it, having reviewed the file—I don't think that there has been a substantial change in circumstances sufficient to justify a further 1368 evaluation. So the motion is denied."

The sentencing hearing continued and defendant was ultimately sentenced.[6]

## B.     Legal Standards

A criminal defendant "cannot be tried or adjudged to punishment while … mentally incompetent." (§ 1367, subd. (a).) "A defendant is mentally incompetent" if a mental disorder prevents the defendant from understanding "the nature of the criminal proceedings" or assisting counsel "in the conduct of a defense in a rational manner." (*Ibid.*) Section 1368 sets forth the procedure for implementing section 1367 protections. Under section 1369, subdivision (f), a defendant is presumed mentally competent unless proved otherwise by a preponderance of the evidence.

---

[6]Defendant did have two additional outbursts during the sentencing hearing. The outburst consisted of defendant stating "Bitch" and "Fucking bitch" while the prosecutor urged the court not to exercise its discretion to strike one of defendant's prior strikes.

State law and federal due process bar the trial or conviction of a mentally incompetent defendant.  (*People v. Rogers* (2006) 39 Cal.4th 826, 846.)  Both

> "require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.]  The court's duty to conduct a competency hearing may arise at any time prior to judgment. [Citations.] Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations.  [Citations.]  But to be entitled to a competency hearing, 'a defendant must exhibit more than … a preexisting psychiatric condition that has little bearing on the question … whether the defendant can assist his defense counsel.'  [Citations.]"
> (*People v. Rogers*, *supra*, at p. 847.)

Under California law, once a competency hearing has been held and thereafter the defendant is "found competent to stand trial, a *second competency hearing* is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.  [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 734, italics added; see, e.g., *People v. Kelly* (1992) 1 Cal.4th 495, 542–543 [no change in circumstance to justify second hearing]; *People v. Jones* (1991) 53 Cal.3d 1115, 1153–1154 [general assertion of defendant's worsening condition and inability to cooperate with counsel inadequate to justify second hearing].)  To warrant a second competency hearing, "[m]ore is required than just bizarre actions or statements by the defendant to raise a doubt of competency.  [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33; accord, *People v. Marks* (2003) 31 Cal.4th 197, 220.)  Also, "when … a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state.  This is particularly true when … the defendant has actively participated in the trial." (*People v. Jones*, *supra*, at p. 1153.)

17.

The evidence disclosing a substantial change of circumstances sufficient to warrant a second competency hearing must itself be substantial. (See *People v. Kaplan* (2007) 149 Cal.App.4th 372, 384–385 [in deciding whether changed circumstances warrant a second competency hearing, trial court does not weigh the evidence; rather, as in assessing the need for initial competency hearing, trial court applies substantial evidence standard of proof].) "In determining the substantiality of the evidence, we look to the record as a whole. [Citation.] Evidence that is ""'reasonable in nature, credible, and of solid value'"" is substantial evidence. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 1004, disapproved on a different point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We review the decision whether to conduct a second competency hearing for an abuse of discretion, mindful that """[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper."""" (*People v. Marshall*, *supra*, 15 Cal.4th at p. 33.)

### C.    Analysis

The trial court initially declared a doubt as to defendant's competency early in the proceedings, and subsequently held a hearing on defendant's competency after defendant was evaluated by Dr. Thomas. The trial court found defendant competent to stand trial based upon the report by Dr. Thomas. Defendant does not argue this ruling was erroneous, rather he argues the trial court erred in failing to hold a second competency hearing pursuant to his counsel's request. Defendant points to the behavior noted above to support his conclusion the evidence demonstrated a substantial change in circumstances regarding his competency since the first hearing. We find no changed circumstances.

Defendant relies on his numerous "outbursts" to support his argument that the record demonstrated a substantial change in circumstances as to his competence. He

argues "[n]o rational defendant would have had [these outbursts] because they cast him in a negative light." Defendant's argument misses the mark.

Evidence that "merely raises a suspicion that the defendant lacks present sanity or competence but does not disclose a present inability because of mental illness to participate rationally in the trial is not deemed 'substantial' evidence requiring a competence hearing." (*People v. Deere* (1985) 41 Cal.3d 353, 358, disapproved on other grounds in *People v. Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9.)

> "If a defendant presents merely a 'litany of facts, none of which actually related to his competence [during the relevant proceeding] to understand the nature of that proceeding or to rationally assist his counsel at that proceeding,' the evidence will be inadequate to support holding a competency hearing. [Citation.] In other words, a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. [Citations.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 508.)

Defendant has failed to demonstrate any of the above behavior relates to his competence to stand trial. None of the behavior exhibited by defendant throughout trial revealed an inability to understand the proceedings or to assist in his defense. To the contrary, several of defendant's so-called "outbursts" evidence his comprehension of the proceedings and his ability to assist his counsel. First we note many of these "outbursts" do not appear to be outbursts at all. There are several references on the record to defendant's loud voice. In addition to the trial court's repeated references to the volume of defendant's voice, defendant himself, and a witness during the trial, all acknowledged defendant's voice was loud. Indeed, the trial court commented during trial it had "been carefully observing [defendant] during the trial. I find that he has been appropriate during the trial in terms of his demeanor and manner, that the only issue that I've had to talk to [defendant] about on occasion is his voice being loud. It carries to people throughout the courtroom." Keeping in mind this observation, which is amply supported by the record, it is apparent many of the "outbursts" recounted by defendant simply

appeared to be defendant making statements to his attorney during trial. A review of these statements demonstrates defendant's comprehension of the proceedings as well as his ability to assist his counsel.

For example, defendant's comment during jury selection that he did not want a particular prospective juror demonstrated he was following the proceedings and assisting in his defense. Defendant understood the particular juror was not sympathetic to his age and, consequently, he expressed his desire not to have this person serve on his jury. Likewise, his comment during the pretrial hearing stating the officer's testimony was a "lie" confirm defendant was listening to the testimony and informing his counsel of his position. These comments show defendant was actively participating in his defense in that he was actually providing his attorney with information during the trial process. He expressed his feelings on the prospective jurors and informed his counsel of testimony he disagreed with. The same can be said of many of the comments during the course of the proceedings. This is in direct contradiction to defense counsel's claims defendant could not communicate about his case.

While the record also demonstrates defendant engaged in some angry or contemptuous outbursts—for example when he complained to the bailiff regarding his bandages, when he made statements he was going to kill a police officer, and when he used profanity and obscene gestures directed at the jury and the prosecutor—these outbursts did not demonstrate any incompetence on defendant's part. Rather, they simply demonstrated his anger either with the proceedings, how he felt he was being treated, and with the outcome of the trial. Defendant argues no rational person would engage in such behavior in front of a jury, as the behavior tended to cast him in a negative light. We disagree. While such behavior is ill-advised and demonstrates poor judgment, it in no way reflects any incompetency to stand trial. There was nothing inherently bizarre or irrational about the behavior. Defendant's expressions of anger and frustration at the proceedings simply do not support a change in circumstances regarding his competency.

20.

Furthermore, as the prosecutor pointed out, defendant had previously engaged in rude and disruptive behavior in court proceedings prior to trial. Defendant has not provided this court with the transcripts of all the pretrial proceedings, but it appears the prosecutor's statement is supported by the record. A jail incident report recounted defendant's outburst, disrobing in court, and his threats made to the judge and bailiff at a pretrial hearing. Indeed, the report indicates defendant was removed from the courtroom during the proceeding due to his behavior. Furthermore, defense counsel's own statements support the same conclusion. During one of her requests to have defendant evaluated for competency she noted the courts "have been aware of [defendant's] almost seeming inability to control his own—I don't—they are not necessarily outbursts, but his own conversations." Thus, the record supports the trial court's finding defendant's behavior "just hasn't changed. That's who he is."

Defendant's use of profanity and his gestures toward the jury, while clearly displaying his anger at the outcome of the proceedings, certainly did not cast a doubt on his competence. Likewise defendant's use of profanity toward the prosecutor at sentencing simply showed his feelings about the arguments being made at the time. Similarly, the comments to the jury during readback, which were not reported, merely showed his frustration with what he perceived to be a juror's inattention to the evidence. None of these actions taken alone or in combination provided substantial evidence defendant did not understand the proceedings.

Our Supreme Court has confirmed "that more is required to raise a doubt of competence than the defendant's mere bizarre actions or statements, with little reference to his ability to assist in his own defense. [Citation.]" (*People v. Medina*, *supra*, 11 Cal.4th at p. 735.) In *Medina*, the court concluded, "Defendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his competence to do so …." (*Ibid.*, italics omitted.) Similarly in this case, no evidence was presented to the trial court linking defendant's disruptive behavior with a mental

21.

disorder or developmental disability preventing him from understanding the proceedings or assisting counsel in presenting his defense.

Defendant's behavior while incarcerated also failed to cast a doubt on his competency. Defendant points to the fact he was housed in the medical ward during the proceedings, he was verbally and sometimes physically assaultive with the jail personnel, and he engaged in behaviors such as flooding his cell to support the argument he was incompetent. However these actions bear no relation to defendant's ability to understand the proceedings or assist his counsel in his defense. The fact defendant was in the medical ward, without more, does not suggest incompetence, especially in light of the fact defendant apparently suffered from a host of medical ailments.

Nor does defendant's expression of anger toward, and lack of respect for, authority figures at the jail lead to the conclusion he is incompetent. Indeed, this behavior is strikingly similar to the behavior of the underlying offense. Simply put, nothing in the facts defendant flooded his cell and was assaultive toward jail staff demonstrated any changed circumstances or new evidence relating to his competence.

The crux of defendant's argument relies on his counsel's comments that defendant could not communicate with her about the case. However, defense counsel's statements, without more, are insufficient to raise a doubt as to his competence. (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285.) While counsel repeatedly stated she could not communicate with defendant about his case, nothing in the record demonstrated any change in circumstances since the first competency hearing. As the trial court observed when counsel made the first request for a second competency hearing, defendant "just hasn't changed."

Defendant argues the record supports counsel's claims he could not communicate with her about his case because he was fixated on the Americans with Disabilities Act. Defendant points to instances where he mentions this subject with the court to buttress his argument. However, defendant's discussion of the topic did not present a substantial

22.

change in circumstances or provide any new evidence casting a doubt on his competence. Dr. Thomas's report clearly stated defendant's "thought process appeared mildly impaired in that he would go off track and need to be redirected back to the topic at hand." Nothing in the record demonstrates this impairment changed in any substantial way. Defendant's fixation on the Americans with Disabilities Act is simply an example of this behavior.

The record supports a finding defendant believed the Americans with Disabilities Act was important to his trial and he mentioned it several times during trial. However, the record likewise supports he did so to *assist* in his defense, as he clearly believed this provided him with a defense. During the jury instruction conferences, when defendant insisted his counsel inform the court about the Americans with Disabilities Act, defendant stated his counsel "should have brought it up a long time ago." Just before the court took the verdict, defendant reiterated things would have gone differently in the trial if his attorney would have told the court he was an American with a disability. Likewise, during the hearing on the priors, defendant stated he wished his "lawyer would have told you guys about ADA to begin with." These references, all occurring within a relatively short period of time of each other, demonstrate defendant was, in fact, communicating about his case with his attorney.

Despite defense counsel's assertions to the contrary, it was also apparent defendant did understand the proceedings and was capable of assisting in his defense. As stated above, defendant spoke with his attorney about the case, oftentimes loud enough for others to hear him. Defendant informed his counsel about what he considered an important defense. That the defense was not valid does not render defendant incapable of assisting in his defense. Further, it was apparent through conversations the court had with defendant that defendant's attention could be redirected to the task at hand, as stated in the report by Dr. Thomas.

For example, during trial, defendant waived a jury trial on the issue of his priors. Counsel stated she had discussed the matter with him, and defendant demonstrated an understanding of the issue. Defendant's reference to double jeopardy during the exchange does not cast doubt on defendant's understanding. When defense counsel stated she could not discuss waiving time for sentencing with defendant because he was insistent on talking about the Americans with Disability Act, the court informed defendant of the situation and had no problem communicating on the matter. While the record does support a conclusion communications with defendant at times could be difficult, as related in the competency report, it was equally apparent defendant could be redirected to the matter at hand. Defense counsel provided no information that contradicted this finding other than her assertion defendant was incapable of discussing the case with her. To the contrary, defense counsel stated defendant had spoken to her about what "his attorney" discussed with him, further indicating he was in fact discussing his case with her.

Furthermore, counsel's statements that defendant referred to "his attorney" in conversations with her did not support a finding of changed circumstances. Defendant clearly referenced his attorney several times during the proceedings, explaining he wanted her to inform the court of certain facts. Defendant's apparent reference to his attorney in the third person in his conversations with her, although unusual, does not support a finding of a substantial change in circumstances. (See *People v. Laudermilk*, *supra*, 67 Cal.2d at p. 285; *People v. Ramirez* (2006) 39 Cal.4th 398, 466-468 [defendant's bizarre behavior during penalty phase of trial insufficient to require competency hearing].)

Similarly, defense counsel's statement that she could not speak to defendant about his prior strike offense in a "rational or reasonable" way is not sufficient to trigger the court's duty to order a second competency hearing. Defense counsel did not provide the

court with any facts demonstrating any incompetency, just her assertion that she felt defendant did not communicate with her about the case.

In short, upon review of the entire record, it is clear there was no evidence presented to the court demonstrating either a significant change in circumstances or new evidence demonstrating defendant's incompetence to stand trial. The trial court's repeated rulings as such were not an abuse of discretion.

## II. Sufficient Evidence Supported the Verdict

Defendant argues the evidence was insufficient to show he committed the crimes "because of" the victim's race. We find the evidence was sufficient to support the verdict.

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever

is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

Section 422.75, subdivision (a) provides: "Except in the case of a person punished under Section 422.7, a person who commits a felony that is a hate crime or attempts to commit a felony that is a hate crime, shall receive an additional term of one, two, or three years in the state prison, at the court's discretion." The term "hate crime" is defined as a "criminal act committed, in whole or in part, because of one or more of the following actual or perceived characteristics of the victim: [¶] … [¶] (4) Race or ethnicity." (§ 422.55, subd. (a).)

Our Supreme Court, in *In re M.S.* (1995) 10 Cal.4th 698, defined the term "because of" as used in sections 422.6 and 422.7, which define similar hate crime enhancements. The court noted the term "because of" meant the "conduct must have been *caused* by the prohibited bias." (*In re M.S.*, at p. 719.) But this does not require the bias be the sole motivating factor. "By employing the phrase 'because of' …, the Legislature has simply dictated the bias motivation must be a cause in fact of the offense, whether or not other causes also exist." (*Ibid.*) In cases where the defendant harbors several concurrent motivations to commit an offense, "the prohibited bias must be a substantial factor in bringing about the crime." (*Ibid.*) In *People v. Superior Court* (*Aishman*) (1995) 10 Cal.4th 735, 741, our Supreme Court explained these rules apply to an enhancement pursuant to section 422.75.

The state may use the defendant's own words when they are directly related to the charged crime to prove the defendant "intentionally selected the victim on the basis of the victim's status." (*In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1753.) Section 422.75 "'requires the state to show evidence of bigotry relating *directly* to the defendant's intentional selection of this particular victim upon whom to commit the charged crime. The state must directly link the defendant's bigotry to the invidiously discriminatory

26.

selection of the victim and to the commission of the underlying crime.' [Citation.]" (*In re Joshua H.*, *supra*, at p. 1753.)

Turning to the facts of the present case, it is apparent the evidence was sufficient to support a finding defendant committed the crimes "because of" the victim's race. Johnson, who is African-American, testified he approached defendant and politely asked him to move to a smoking section. After Johnson made his request, defendant replied he "wasn't going to let any nigger tell him what to do." He repeated this several times. Defendant proceeded to threaten Johnson's life, stated he would "cut" him, he would stab him, and told Johnson he had a knife. Subsequently, defendant produced a pocketknife, extended the blade, and lunged toward Johnson with the knife. Throughout the ordeal, defendant repeatedly hurled racial slurs at the victim.

From this evidence the jury could infer that, at the very least, the victim's race was a substantial factor in motivating the threats and assault upon Johnson. Defendant argues the only reasonable conclusion from the evidence is defendant "committed these crimes because Johnson told him to stop smoking in a non-designated smoking area and that angered [defendant.]" We disagree. The jury could reasonably infer from the fact defendant stated he was not "going to let any nigger tell him what to do" that defendant's motivation to threaten and assault the victim stemmed from his racial bias. While we agree with defendant that the evidence also established he is a "defiant individual who does not like people telling him what to do," and he "apparently is racist," these facts are not at odds with a finding that his crime was also racially motivated. Indeed, defendant continued to use racial epithets throughout the ordeal, demonstrating his racial motivation for the attack.

Relying on *In re M.S.* and *People v. Lindberg* (2008) 45 Cal.4th 1, defendant argues the fact the victim initially approached defendant precludes a finding the attack was racially motivated. Not so.

27.

In *In re M.S.*, the Supreme Court found the minors' attack upon the victims was motivated by the victims' sexual orientation. There, the minors along with two adult cohorts yelled antigay epithets toward the victims as they drove to a restaurant. The group yelled they were going to kill the victims and stated, "'We are going to get you faggots." (*In re M.S.*, *supra*, 10 Cal.4th at p. 708.) During a subsequent confrontation, the minors and the adult counterparts hit and kicked the victims, causing one victim to lose consciousness. In rejecting a claim that the evidence was insufficient to support a finding the minors committed the crimes because of the victims' sexual orientation, the court noted the violence and threat of violence, coupled with the antigay epithets, provided substantial evidence of the bias motivation. (*Id*. at p. 727.)

In *People v. Lindberg*, *supra*, 45 Cal.4th 1, the defendant confessed to stabbing the victim to death. The defendant told his cousin he had "killed a jap" (*id*. at p. 8) "for [the] racial movement" (*id*. at p. 9). The defendant was involved in the White power movement, and evidence found in his home supported the finding he was a White supremacist. The defendant was known to use derogatory terms to describe minorities and had previously been involved in an incident where he harassed an Asian man.

Defendant attempts to distinguish these cases, pointing out in each case the defendant sought out the victim for the attack. However, nothing in either case requires the defendant actively seek out the victim so long as the evidence establishes the offense was racially motivated. As we have explained, the evidence supported a finding the threats and assault were motivated by the victim's race. The facts support the reasonable inference that defendant reacted violently to Johnson's request *because* Johnson was African-American. Johnson testified he did not know defendant, thus there was no history of animosity between the two. Johnson did not provoke defendant or make any aggressive gestures toward him, rather he simply requested defendant smoke in a different area. Significantly, it was at this point defendant singled out Johnson because of his race. Although one could infer defendant reacted partly because he did not appreciate

the request to move, the evidence also supports the reasonable inference that defendant's racial bias was a substantial factor in defendant's decision to threaten and assault Johnson. Therefore, defendant's claim fails.

## III. Trial Court Instruction Regarding Preliminary Hearing Was Not Error

During trial, Johnson was questioned extensively about statements he made at the preliminary hearing. During the questioning related to that prior testimony, the trial court interjected the following:

> "Before you ask a question, let me just explain to the jury, you've heard references to a preliminary hearing. In the criminal justice process, a preliminary hearing is often held as a screening hearing to determine whether or not there is sufficient legal reason to go forward with a case to ultimate trial. So a preliminary hearing occurs, obviously, before the trial, but that is its purpose. It is not the same as a trial. There are different procedures and different issues and standards, but it is a screening hearing."

Defense counsel objected to the above statement, arguing the court's instruction "could leave the jury with the idea that there's already been a hearing that's determined that [defendant] is guilty of something or was found to be responsible for something." On appeal, defendant argues the instruction usurped the jury's role and bolstered the prosecution's case by in effect telling the jury "some trier of fact first determined that there was sufficient evidence of the defendant's guilt to bind him over for trial." We find defendant's argument unpersuasive.

It is well settled that the jury is the exclusive arbiter of questions of fact and credibility of witnesses. (§ 1127; *People v. Cook* (1983) 33 Cal.3d 400, 408, overruled on other grounds by *People v. Rodriguez* (1986) 42 Cal.3d 730, 770.) While it is permissible for a trial court to comment on the evidence (*People v. Brock* (1967) 66 Cal.2d 645, 650, overruled on another point in *People v. Cook*, *supra*, at p. 413, fn. 13; *People v. Cook*, *supra*, at p. 407), it is improper for a court to express to the jury its opinion as to the defendant's guilt as such an expression of opinion may invade the defendant's right to have a jury decide his guilt or innocence. (*People v. Cook*, *supra*, at pp. 412-413; *People v. Rodriguez*, *supra*, at pp. 766-769.) Similarly, a party's reference

29.

to a prior court's or jury's determination of guilt is improper as a defendant is "surely entitled to a trial uninfected by hearsay references to conclusions which others have reached." (*People v. Modesto* (1967) 66 Cal.2d 695, 715, overruled on other grounds by *People v. Sedeno* (1974) 10 Cal.3d 703, 721, overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 163, and *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383.)

Thus, it is clear neither the court nor a party may inform the jury as to its opinion on guilt or innocence or previous findings of fact by another arbiter. Using this proposition, defendant claims the trial court's instruction to the jury describing a preliminary hearing allowed the jury to infer the court had previously determined there was "believable evidence of [defendant's] guilt." We disagree with defendant's conclusion as to the reasonable inference one could draw from the court's instruction. The trial court's comment never informed the jury any *factual* issue was previously determined in the case. To the contrary, the court specifically stated the preliminary hearing is a "screening hearing to determine whether or not there is sufficient *legal* reason to go forward with a case to ultimate trial." (Italics added.) The court further emphasized, "It is not the same as a trial. There are different procedures and different issues and standards, but it is a screening hearing."

The court's comment clearly referred to the prior hearing as determining only legal issues with different procedures and standards than a jury trial. This is important as the jury was later instructed it was the ultimate trier of fact, while the court was tasked with determining the law. In accordance with CALCRIM No. 200, the trial court informed the jury it "must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." The court also informed the jurors the court "will now instruct you on the law that applies to this case" and further instructed they must follow the "law as I explain it to you, even if you disagree with it." These instructions provided a distinction between

30.

legal issues to be decided by the court, and factual issues to be decided by the jury. We must assume the jurors generally understood and faithfully followed these instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331.)

Reading the instructions together with the court's comment on the purpose of a preliminary hearing, the jury was told any issues decided at the preliminary hearing were legal ones for the court to decide, not factual ones. There was nothing in the court's comment that would lead the jury to conclude any factual issues were resolved by the court. As the jury was never informed as to the trial court's opinion as to defendant's guilt, nor was it ever informed as to any factual issue resolved by any other trier of fact, defendant's claim the jury would have placed undue emphasis on that opinion necessarily fails.

**IV.  The Trial Court Was Required to Instruct on the Lesser Included Offense of Attempted Criminal Threats**

Defendant argues the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of attempted criminal threats as the evidence supported a finding the victim was not reasonably in sustained fear as a result of defendant's threats. We agree.

Instruction on a lesser included offense must be given sua sponte when the evidence raises a question whether all of the elements of the charged offense are present and there is substantial evidence justifying a conviction of such a lesser offense. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) "*[E]very* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 155.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of

reasonable [persons] could … conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*Id.* at p. 162.)

In *People v. Toledo* (2001) 26 Cal.4th 221, our Supreme Court addressed whether the crime of attempted criminal threats was a valid offense in California. The court held such an offense did exist in this state. (*Id*. at p. 235.) The court explained, as is relevant to the present case:

> "[I]f a defendant, again acting with requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*People v. Toledo*, *supra*, 26 Cal.4th at p. 231.)

"Section 422 … requires that the threat be such as to cause a reasonable person to be in *sustained fear* for his personal safety." (*In re Ricky T.* (2001) 87 Cal.App.4th. 1132, 1139.) The words, "sustained fear" are not defined in section 422 but have been interpreted to mean "a period of time that extends beyond what is momentary, fleeting or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 ["[f]ifteen minutes of fear" more than satisfies "sustained fear" requirement].) Fear that does not exist beyond the moments of the verbal encounter does not qualify as "sustained" fear under section 422. (*In re Ricky T.*, *supra*, at p. 1140.) In evaluating the evidence, "all of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013; see *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431.) Thus, the jury can properly consider a later action taken by a defendant, as well as the victim's conduct after the incident, in evaluating whether a victim was in sustained fear as a result of a threat. (See *People v. Solis*, at p. 1014.)

The evidence at trial was sufficient to support the jury's finding defendant's threat to stab Johnson actually caused Johnson to be in sustained fear for his safety, and his fear was reasonable under the circumstances. However, although sufficient to support his

32.

conviction for making a criminal threat, the jury, if properly instructed, could have also concluded from the evidence presented that the period between defendant's threat and his being subdued on the ground by Johnson was momentary, fleeting or transitory. Johnson testified when defendant threatened to cut or stab him shortly after he pushed defendant backwards, he was in fear for his safety. It was at that point Johnson again retrieved his pepper spray, began shaking it while walking backwards, and then sprayed defendant in the eyes. According to People's exhibit 1, the video of the incident, approximately 30 seconds passed from the time Johnson pushed defendant away to the time he deployed his pepper spray. After deploying the pepper spray, Johnson backed away momentarily, then approached defendant, knocking him to the ground and securing him in handcuffs. The jury, in evaluating this evidence, could have concluded Johnson's fear was not "sustained." Indeed, defendant argued during closing arguments any fear experienced by Johnson during the incident was fleeting. Further, there was evidence adduced at trial establishing Johnson was younger and larger than defendant, Johnson believed defendant was intoxicated or senile during the incident, and defendant had trouble standing at one point during the encounter. In sum, substantial evidence supported a finding Johnson was not placed in reasonable, sustained fear during the ordeal.

As the People point out, the failure of a trial court to instruct sua sponte on a lesser included offense is "evaluated under the generally applicable California test for harmless error" announced in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 176.) Under this standard, a conviction will be reversed only if it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (*Id.* at p. 178.) In making this determination, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Id.* at p. 177.)

33.

We believe there was a reasonable probability defendant could have obtained a more favorable outcome if the jury had been instructed on the offense of attempted criminal threat. The evidence on the question of sustained fear was fairly well balanced. On the element of sustained fear, the entirety of the evidence was as follows: "[THE PROSECUTOR:] Q. Okay. Were you in fear for your safety and scared when all of this was taking place? [¶] A. Yes, ma'am." On appeal, were we passing simply on the question of substantial evidence, this evidence is sufficient to support the jury's verdict. On the other hand, however, the evidence that any fear was fleeting was also supported by the record, especially in light of the fact of the relatively brief nature of the encounter and the fact Johnson never testified as to the duration of his fear. As such, failure to instruct on the lesser included offense of attempted criminal threats was prejudicial.

Defendant argues this error requires a reversal of the count. We disagree. Under section 1260, appellate courts possess the authority to modify a judgment to reflect a conviction of a lesser and included offense when the evidence warrants it. (*People v. Matian* (1995) 35 Cal.App.4th 480, 488.) "'Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. [Citations.]' [Citation.]" (*People v. Edwards* (1985) 39 Cal.3d 107, 118; *People v. Moretto* (1994) 21 Cal.App.4th 1269, 1278.) Due process concerns are not implicated when the trial court modifies the verdict to a lesser and necessarily included offense, provided the evidence supports a conviction of the lesser offense. (*People v. Matian*, *supra*, at p. 488.)

In this case, the omitted instruction is relevant only to one element of the charged offense—sustained fear. When this element is subtracted, the remaining elements support a conviction of attempted criminal threat. The record contains substantial evidence supporting this lesser offense.

Yet, because adequate evidence was presented from which a properly instructed jury reasonably could convict defendant of the charged offense, the People may wish to retry defendant on the more serious charge.

Therefore, the proper disposition is one that preserves both options. This is accomplished by giving the People the option of retrying the greater offense or accepting a reduction to the lesser offense. (*People v. Edwards*, *supra*, 39 Cal.3d at p. 118 [instructional error results in modification of judgment to lesser offense with retrial option]; *People v. Moretto*, *supra*, 21 Cal.App.4th at pp. 1278-1279 [same]; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1596 [same].)[7]

## V.       Section 4019 Conduct Credits

Defendant's final contention on appeal is that additional presentence credits should be awarded to him based upon the amendments to section 4019, operative October 1, 2011. He argues failure to award the additional credit constitutes a violation of equal protection principles. This court has previously addressed, and rejected, the equal protection arguments raised here by defendant in our decision in *People v. Ellis* (2012) 207 Cal.App.4th 1546. Defendant acknowledges *Ellis* but asks this court to reconsider its opinion. We decline defendant's invitation.

Section 4019, subdivision (h) specifically states the changes increasing credits were to apply prospectively only. In *Ellis*, we concluded the intent of the Legislature "was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011." (*People v. Ellis*, *supra*, 207 Cal.App.4th at p. 1553.) It is undisputed defendant's offenses were committed before this date.

"The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally." (*People v.*

---

[7]As this disposition requires either a retrial on the criminal threats charge, or a reduction of the charge to attempted criminal threats and therefore a resentencing by the trial court, it is unnecessary to reach defendant's claims on this count related to the improper exercise of sentencing discretion by the trial court.

*Brown* (2012) 54 Cal.4th 314, 328.)  Contrary to defendant's contention, the amendments to section 4019, operative October 1, 2011, do not treat similarly situated groups in a disparate manner.  (*People v. Ellis*, *supra*, 207 Cal.App.4th at pp. 1551–1552.)  Rather, the amendments to section 4019 address "'*future conduct* in a custodial setting by providing increased incentives for good behavior.'"  (*People v. Ellis*, *supra*, at p. 1551.)  Thus, prisoners serving time before and after the effective date of a statute affecting conduct credits are not similarly situated for purposes of equal protection analysis.  (*People v. Brown*, *supra*, at pp. 329-330.)  The correctional purpose of a statute that rewards behavior is not served by rewarding prisoners who served time in custody prior to the effective date of the incentives because they could not have modified their behavior in response to the incentives.  (*Id.* at p. 329.)  Because defendant fails to show section 4019 treats "similarly situated" groups unequally, he asserts no cognizable equal protection claim.

## DISPOSITION

The criminal threats conviction in count 2 is reversed with these directions:  If the People do not bring defendant to trial within 60 days after the filing of the remittitur, the trial court shall proceed as if the remittitur constitutes a modification of the judgment to reflect a conviction in count 2 of attempted criminal threat and shall resentence defendant accordingly.  In all other respects, the judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
DETJEN, J.

36.